1              IN THE UNITED STATES BANKRUPTCY COURT

2            FOR THE SOUTHERN DISTRICT OF TEXAS

3                    HOUSTON DIVISION

4   IN RE:                    §     CASE NO. 21-30923-11
                              §     HOUSTON, TEXAS
5   GRIDDY ENERGY, LLC,       §     THURSDAY,
    ET AL,                    §     APRIL 29, 2021
6              DEBTORS.       §     8:59 A.M. TO 10:38 A.M.

7          STATUS CONFERENCE/MOTION HEARING (VIA ZOOM)

8         -- -- -- -- -- AND -- -- -- -- --

9   LISA SANDIFER KHOURY      §     CASE NO. 21-3041-ADV
                              §     HOUSTON, TEXAS
10  VERSUS                    §     THURSDAY,
                              §     APRIL 29, 2021
11  GRIDDY ENERGY, LLC        §     8:59 A.M. TO 10:38 A.M.

12                MOTION HEARING (VIA ZOOM)

13
            BEFORE THE HONORABLE MARVIN ISGUR
14            UNITED STATES BANKRUPTCY JUDGE

15

16      APPEARANCES:                (SEE NEXT PAGE)

17

18

19      (Recorded via CourtSpeak; No log notes)

20

21                TRANSCRIPTION SERVICE BY:

22          JUDICIAL TRANSCRIBERS OF TEXAS, LLC
              935 Eldridge Road, #144
              Sugar Land, TX 77478
23                 281-277-5325
              www.judicialtranscribers.com

24
        Proceedings recorded by electronic sound recording;
25        transcript produced by transcription service.


                    JUDICIAL TRANSCRIBERS OF TEXAS, LLC

2

1                          APPEARANCES (VIA ZOOM):

2
    FOR THE DEBTOR:                 BAKER BOTTS, LLP
3                                   Robin Spigel, Esq.
                                    30 Rockefeller Plaza
4                                   New York, New York  10112
                                    212-408-2545
5
                                    BAKER BOTTS, LLP
6                                   John Lawrence, Esq.
                                    2001 Ross Avenue
7                                   Suite 900
                                    Dallas, Texas  75201
8                                   214-953-6873

9   FOR OFFICIAL COMMITTEE
    OF UNSECURED CREDITORS:         MCDERMOTT WILL & EMERY, LLP
10                                  Charles R. Gibbs, Esq.
                                    2501 N Harwood Street
11                                  Suite 1900
                                    Dallas, Texas  75201
12                                  14-295-8063

13                                  MCDERMOTT WILL & EMERY, LLP
                                    Darren Azman, Esq.
14                                  340 Madison Avenue
                                    New York, New York  10173
15                                  212-547-5615

16  FOR LISA KHOURY:                POTTS LAW FIRM, LLP
                                    Derek Potts, Esq.
17                                  3737 Buffalo Speedway
                                    Suite 1900
18                                  Houston, Texas  77098
                                    713-963-8881
19
    FOR KAREN PRESCOTT:             JORDAN HOLZER & ORTIZ, PC
20                                  Shelby A. Jordan, Esq.
                                    500 N Shoreline
21                                  Suite 900 N
                                    Corpus Christi, Texas  78401
22                                  361-884-5678

23

24  (Please also see Electronic Appearances.)

25

1                                    INDEX

2

3    WITNESS:                    Direct   Cross   Redirect   Recross

4    (NONE)

5

6
     EXHIBITS:                      Marked    Offered   Received
7
     DEBTOR'S EXHIBITS
8      No. 218-2:                              13        14
       No. 218-3:                              13        14
9
     COMMITTEE'S EXHIBITS
10     No. 197:                                15        16

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          HOUSTON, TEXAS; THURSDAY, APRIL 29, 2021; 8:48 A.M.

2          THE COURT:  All right.  Good morning.  We're here

3    in the Griddy Energy case.  It is Case 21-30923.

4          We also are here on a related adversary

5    proceeding, which is Khoury versus Griddy, 21-3041.

6          Appearances have been made electronically.  If

7    there's anyone that wishes to appear that hasn't yet made an

8    electronic appearance, let me ask you to go onto our

9    website, get that done this morning, but we'll go ahead and

10   proceed with the hearing.

11         I think what we'll do is start this morning with

12   a report -- a status report from Debtor's counsel and they

13   can then let us know where we are.  So if I can get lead

14   counsel for Debtor, who wants to give us that status report

15   to please press five star on your phone.

16         MS. SPIGEL:  Good morning.  Robin Spigel, Baker

17   Botts, counsel for the Debtor.  Thank you for your time

18   today, we appreciate it.  There are three items on the

19   agenda today: the Debtor's Motion to conditionally approve

20   its Disclosure Statement for its proposed Second Amended

21   Plan, and the approval of the voting and other confirmation

22   procedures.  There's a motion -- there's the Debtor's Motion

23   to Quash and for a protection order and a motion for entry

24   of an order authorizing ordinary course professionals.

25         Related to the -- just a quick update, since we

1    were here last, which was on April 1st, regarding the

2    appointment of a committee, the US Trustee appointed

3    unsecured creditors' committee late on March 31st and as

4    Your Honor know, three former customers were appointed to

5    the Committee.

6             On April 6th, the Committee hired McDermott Will

7    and Emery as their counsel.

8             And on April 16th, the Debtor learned that the

9    company had also hired a financial advisor, Province.  Those

10   retention applications are filed on April 26th.

11            On April 8th, the Debtor had sent the proposed

12   former customer Bar Date Order and related notice that we

13   had fully negotiated with the Attorney General's Office to

14   the Committee.  We haven't received full comments yet from

15   the Committee but we hope to be in a position to submit that

16   Order to the Court next week.  I suppose if we can't resolve

17   all issues that we have we can put it on for hearing but I'm

18   hopeful that we can get to a consensual place.

19            There have been a bunch of second day motions

20   that we have consensually resolved with parties-in-interest

21   including the Committee and the U.S. Trustee and those

22   Orders have been entered.

23            Unless Your Honor has any questions related to

24   what I've just talked about, I can move on to the first item

25   on the agenda.

1          THE COURT:  I'll see if anybody else wants to

2  make any kind of an opening status report as well and then

3  we'll come back to you for the first item on the agenda.

4          From 214-295-8063, who do we have on the phone?

5          MR. GIBBS:  Your Honor, good morning.

6          This is Chuck Gibbs from McDermott Will and

7  Emery.  With me is my partner, Darren Azman.  I wasn't

8  necessarily raising my hand to speak with respect to your

9  request for status updates, but just to make sure my line

10 was open as we moved into the agenda, but I'm happy to

11 address any questions the Court might have at this time with

12 me.

13         THE COURT:  Mr. Gibbs, thank you and good morning

14 to you.

15         MR. GIBBS:  Good morning.

16         THE COURT:  Is there anyone that wishes to make

17 any sort of status report?  Otherwise I'll go back and let

18 Ms. Spiegel move through her agenda.

19     (No verbal response.)

20         THE COURT:  All right.  Ms. Spiegel?

21         MS. SPIGEL:  Thank you, Your Honor.  The first

22 item on the agenda is the Debtor's Disclosure Statement

23 Motion.  That's at Docket No. 24.  The Debtor originally

24 filed a proposed plan and related disclosure statement on

25 the petition date, which is March 15th.  Those documents can

1   be found at Docket No. 22 and 23.

2          On April 19th, an amended plan and disclosure

3   statement was filed with the Court that among other things

4   contained additional compromise and settlements related to

5   former customers.  Those documents can be found at Docket

6   Nos. 175 and 176.

7          On April 27th, the Debtor filed a further amended

8   plan and related disclosure statement that attempted to

9   address certain of the objections that were filed by the

10  Committee and ERCOT to the Disclosure Statement.  Redlines

11  marked against both the April 27th Disclosure Statement and

12  Plan as well as the original Plan were filed with the Court

13  on April 27th and those can be found at Docket No. 213 for

14  the Disclosure Statement and 212 for the Plan.

15         With respect to the Disclosure Statement, as I

16  noted, the Creditors' Committee and ERCOT each timely filed

17  objections and Ms. Karen Prescott, an alleged tort claimant,

18  filed a late objection on the evening of April 26th.

19         I would like to note that the Committee filed a

20  motion to seal related to its objection.

21         The Debtor files a reply to the objection at

22  Docket No. 215 and the Debtor also filed a motion to seal.

23         With respect to the UCC objection, we've

24  stipulated with each other that each of our exhibits can be

25  moved into evidence solely for the purposes of today's

1   hearing.  I just want to be clear because (indiscernible)

2   agreed with ERCOT, we are not going to seek to move in the

3   Mr. Fallquist's, the CEO, First Day Declaration that was

4   listed on our -- the Debtor's witness and exhibit list.

5               THE COURT:  So let me -- before we get too far, I

6   reviewed those documents and really saw no reason to seal

7   them.  I was assuming that the Committee's objection was

8   sealed because it relied on discovery and that discovery

9   might have been a seal kind of an issue rather than really

10  having anything in there that mattered.  I don't want to

11  over-seal documents.

12              Mr. Gibbs, is there something that you need

13  sealed?  And if, in fact, you've done it for the somewhat

14  procedural reason that I've identified, I want to find out

15  from I guess whoever produced the documents, which I would

16  assume would be the Debtor, whether there's a reason, in

17  fact, to seal your objection.

18              MR. GIBBS:  Thank you, Your Honor.  Again for the

19  Record, Chuck Gibbs with McDermott Will and Emery, counsel

20  for -- proposed counsel for the Official Unsecured

21  Creditors' Committee.  We filed that Motion for Seal for

22  exactly the reason you articulated.  It was because

23  information -- that certain of the information in our

24  Objection and in the exhibits were provided to us by the

25  Debtor pursuant to a protective order that's been discussed

1    and also provided to us under professional eyes only.

2              THE COURT:  Right.

3              MR. GIBBS:  So we didn't want to be in violation

4    of any agreements or any court order to that effect.

5              And there are a couple of either emails or

6    documents that were contained within the exhibits that had

7    potential information regarding valuation of certain of the

8    Debtor's assets that we thought may not be in the best

9    interest of the Debtor and its creditors to have in the

10   public domain should those assets be later marketed for

11   sale, for that reason only.

12             THE COURT:  So I actually looked at the unsealed

13   version and I haven't looked to see what all you did seal.

14             Where is the sealed document filed?  And I just

15   want to be sure we're not over-sealing?  I don't want --

16   nothing in your Objection raises --

17             MR. GIBBS:  Your Honor, if I could --

18             THE COURT:  -- anything of that nature and I'm

19   concerned people will think that we're sealing something

20   because it's got some major hidden secrets and that's just

21   not what's going on here and I want to be as open as we can

22   about the case so.

23             MR. GIBBS:  We agree with that.  And I'm

24   scrambling to find the docket number for the sealed version

25   and I'll ask either my partner, Darren Azman, or my

1   colleague, Darren Yang (phonetic), to chime in with the

2   Court's permission to provide that information at this time.

3            THE COURT:  That'd be great if one of them could

4   tell me what -- or we can come back to this, but what I

5   don't want to do is to over-seal.

6            Ms. Spiegel, other than the few items that

7   Mr. Gibbs is mentioning that might be in the valuation issue

8   in the attachments, for the body of the Objection, was there

9   anything in there that was of great concern to you all?  And

10  again, I don't have a problem that people are going through

11  this, tried to produce stuff quickly and so you all have

12  confidentiality agreements.  I think I've even approved all

13  those for you.  I just don't want to now result in sealing

14  that gives the wrong impressions whatsoever.

15           MS. SPIGEL:  There is -- in the body of the

16  Committee's Objection, is that what you were asking about --

17           THE COURT:  Yes.

18           MS. SPIGEL:  -- in particular?

19           THE COURT:  Yes.

20           MS. SPIGEL:  Okay.  There is some sensitive

21  business information in the objection, but we actually --

22  the Debtor in our reply didn't -- some of the information

23  that they sealed, we don't have sealed in our reply.

24           THE COURT:  You sealed very -- I did find your

25  sealed version and you sealed like three numbers.  I didn't

1  have a problem with that in yours.  It was more theirs that

2  I didn't really see the redactions on theirs.

3          MS. SPIGEL:  Yes.

4          THE COURT:  Can I get this -- instead of me

5  signing sealing orders today, which aren't urgent, if can

6  get you all to now look at those documents and file them

7  with as little redaction as you think is appropriate and

8  then let me review those?  I don't need to go through that

9  in detail today, Mr. Gibbs, we can proceed with the hearing.

10          MR. GIBBS:  Okay.

11          THE COURT:  But I'm largely not going to be over-

12  sealing is the message I want to give.  And again I just had

13  zero problem that in the rush of producing things, people do

14  these confidentiality agreements.  They're important to do.

15  You need to respect them.  And now I want to try and back

16  off of that a bit and get stuff out in the public record

17  where things look pretty normal in these objections.

18          I'm not saying that there aren't objections that

19  may be very meritorious and I don't want you to read me

20  wrong, Mr. Gibbs, but there's wasn't anything in there that

21  was secret or (indiscernible) or anything of that nature.

22          MR. GIBBS:  We agree with that.

23          THE COURT:  So let's move ahead then.  And I'm

24  sorry to take you all on that diversion but important I

25  think.

1          MS. SPIGEL:  And I appreciate it.  I do want to

2     say that we appreciate the Committee -- I hear what

3     Your Honor's saying and I just want to say for the Record we

4     appreciate the Committee filing under seal because we did

5     provide it confidentially to them, but we are happy to work

6     with them so that it would be -- we'll just work with them

7     to figure out the minimal amount that we think needs to be

8     unsealed.

9          I will note that there are documents attached to

10    the Committee's witness list that do contain sensitive

11    information, business information that we were going to seal

12    but we can -- we'll work it out with them and then present

13    something to Your Honor.

14          THE COURT:  Thank you.

15          So did you all want to pre-admit exhibits now or

16    do you want to offer them during the course of the hearing?

17          MS. SPIGEL:  I'm fine offering --

18          MR. GIBBS:  Your Honor, I'd appreciate it if we

19    can admit them now but it's the Debtor's Motion.

20          MS. SPIGEL:  That's fine.

21          MR. GIBBS:  I will do it any way the Debtor would

22    like, that's fine.

23          THE COURT:  Ms. Spiegel?

24          MS. SPIGEL:  We could pre-admit them.  Yeah,

25    no, we can pre-admit them.  I may need my partner,

1   John Lawrence, who's also on the line.  I may need him to

2   weigh in.  We are only going to admit -- seek to admit two

3   exhibits into evidence.

4           THE COURT:  All right.  Well, let me get -- is it

5   Mr. Newcomb?  Mr. Newcomb I think filed it.  Is he the one

6   that's going to know that or someone else?

7           MS. SPIGEL:  I think I can do it although

8   Mr. Newcomb can correct me if I do it wrong.

9       (Laughter.)

10          THE COURT:  All right.

11          MS. SPIGEL:  Okay.  Thank you, Your Honor.

12          THE COURT:  Mr. Newcomb, why don't you press five

13  star just so that you can come step on Ms. Spiegel's toes if

14  that's appropriate?  Get your line activated.

15          MS. SPIGEL:  Thank you, Your Honor.  Okay.

16  On the witness and exhibit list, we listed as No. 2 the

17  Declaration of Mr. Fallquist in support of our reply, the

18  Debtor's reply and we'd like to offer that into evidence.

19          THE COURT:  So 218-2 is offered.

20          And what else are you offering?

21          MS. SPIGEL:  We'd like to offer the three-month

22  cash flow, which is 218-3 or No. 3.

23          THE COURT:  Is there any objection to 218-2 and

24  218-3 being admitted as substantive evidence at today's

25  hearing?

1         (No verbal response.)

2              THE COURT:  All right.  218-2 and 218-3 are each

3    admitted.

4         (Debtor's Exhibit Nos. 218-2 and 218-3 received as

5    evidence.)

6              THE COURT:  Do the opposing parties have exhibits

7    that they wish to introduce?  And I know this may go beyond

8    the Committee.

9         (No verbal response.)

10             THE COURT:  Mr. Gibbs, if you said something, I

11   couldn't hear you.

12             MR. GIBBS:  No I did not.  I thought you were

13   asking for request for evidence from any other opposing

14   party besides us so I was just --

15             THE COURT:  Including you and anyone else is all

16   I was saying so we'll start with you.

17             MR. GIBBS:  Okay.

18             THE COURT:  What are your exhibits?

19             MR. GIBBS:  Okay.  Your Honor, our witness and

20   exhibit list was filed at Docket No. 211 and we would offer

21   Exhibits 211-1 through 211-7.  And 1 is the Declaration of

22   my partner, Mr. Azman, and 2 through 7 are the exhibits that

23   are attached to Mr. Azman's Declaration.

24             THE COURT:  So really what we're admitting is 197

25   with its attachments; is that right?

1          MR. GIBBS:  Yes, Your Honor.

2          THE COURT:  Any objection to the admission of 197

3  with its attachments?

4          MS. SPIGEL:  Your Honor, I thought that it was

5  Document No. 211.

6          THE COURT:  211 lists them, but it's not the

7  documents themselves.  It refers back to 197.

8          MS. SPIGEL:  Oh, I'm sorry.  I'm sorry.  Got it.

9  Thank you.

10          THE COURT:  So any objection to admitting 197

11  substantively?

12          And did I get that right, Mr. Gibbs?

13          MR. GIBBS:  You did, Your Honor.  It's Docket No.

14  197.  It's the actual Declaration of Mr. Azman with the

15  exhibits attached.  They're just identified on the witness

16  list, which is Document 211.

17          THE COURT:  From 212-547-5615, who do we have on

18  the phone?

19          MR. AZMAN:  Your Honor, it's Darren Azman from

20  McDermott Will and Emery for the Committee.  I had un-muted

21  a few moments ago just to assist Mr. Gibbs in case he needed

22  it, but he got through it just fine.

23          THE COURT:  Mr. Azman, he usually needs it so

24  feel free.  I'll just leave you on the line.

25          (Laughter.)

1          THE COURT:  We'll go ahead and admit 197.

2          (Committee's Exhibit No. 197 received in evidence.)

3          MR. GIBBS:  I'll have a running request,

4   Your Honor.  Please don't mute Mr. Azman.

5          THE COURT:  I'll try and leave him on.

6          MR. GIBBS:  Thank you.

7          THE COURT:  All right.  Ms. Spiegel?

8          MS. SPIGEL:  Okay.  Thank you, Your Honor.  Okay.

9   I just want a note related to the sealing, I think parties

10  also have agreed to try and avoid using confidential

11  information today to the extent it's possible.  I suppose if

12  something comes up and it becomes necessary, we'll just stop

13  and ask Your Honor exactly how to proceed, but we are going

14  to try to use -- take efforts not to do that.

15         THE COURT:  Yeah, just feel free to object as

16  often as you need to to be sure that we appropriately

17  protect stuff.  We've got a couple of ways of doing it.  One

18  is: we can literally seal and resume to seal the electronic

19  hearing.  It's usually easier if the people that are

20  entitled to see the documents open it up on their own

21  computer and then I simply don't broadcast it, but we'll go

22  how you need to go.

23         MS. SPIGEL:  Okay.  Thank you, Your Honor.  While

24  we'll get to the objections later in the presentation, we do

25  want to note that just up front that with respect to the

1   ERCOT objection, we have consensually resolved that

2   objection and obviously ERCOT can weigh in when we get to

3   the objections.

4           And we've agreed to revise the proposed timeline

5   to object or estimate to their claim, which again we'll go

6   over when we get to the Disclosure Statement Order but I

7   wanted to just preview that up front.

8           THE COURT:  Okay.  Thank you.

9           MS. SPIGEL:  Thank you.  So, Your Honor, before I

10  get to the substance of the Disclosure Statement, I do want

11  to just talk briefly and put everything in context here.  We

12  see this as not a complicated case.  We think it's a unique

13  case but that it's not complicated.  The Debtor's view is

14  that the winter storm events and extreme pricing destroyed

15  the Debtor's business.  Customers didn't pay their bills and

16  ERCOT mass transitioned the Debtor's customers.

17          The Debtor was solvent prior to some point during

18  the winter storm event.  During the winter storm event, the

19  Debtor's management actually took the unusual step of trying

20  to get their customers to move off their platform.  They

21  tried to do this before the winter event and during winter

22  event.  And although the Committee casts unsubstantiated

23  aspersions at the directors and officers, at all times the

24  directors and officers acted in the best interest of the

25  company.  And there are no facts, no evidence to the

1  contrary.  The Debtor ended up filing this case as a

2  liquidating 11.  So once again, tried to do the right thing

3  by all parties including customers because there's been no

4  relief from the legislature or otherwise.

5          The proposed Plan, as I explained on the First

6  Day, is unique.  To us, the Plan is about is collective

7  consciousness.  The Debtor believes that maximizing value

8  can also include providing relief to customers and that's

9  what the Plan does.  If the Plan is confirmed and goes

10 effective, it will be the result of among other things

11 creditors doing the right adjusting under these

12 circumstances.

13         But the Committee has disregarded this collective

14 consciousness and has taken a scorched Earth approach and

15 going to leave the case administratively insolvent.  As I've

16 mentioned, they hired a financial advisor on an hourly basis

17 in a case that can ill afford another advisor and frankly we

18 don't think there's anything a financial advisor can do.

19         As stated in our reply, the Committee simply is

20 seeing that (indiscernible) where none exist.  We had

21 (indiscernible) that Your Honor wanted a customer committee

22 to be appointed to act as a fiduciary for customers, but

23 instead an unsecured creditors' committee was appointed that

24 has no general unsecured creditors and its numbers are also

25 in their customers.  And they're spending down the limited

1  resources of the Estate in name of exercising their

2  fiduciary duties.

3          The Committee says the Debtor hasn't been

4  cooperating, but it has and the facts show otherwise.  More

5  than 2,000 documents and more than 7,000 pages have been

6  produced and the Committee apparently is now going to seek

7  discovery on all the directors and officers and the Debtor's

8  non-debtor affiliates.  And at least with respect to the

9  directors and officers, those parties are going to have

10 indemnification claims against the Estate, which will

11 further burn the Estate assets.

12          The Committee asked us for a three-month delay of

13 the Disclosure Statement Hearing and then this week asked

14 for a two-week delay and although we'll get to the Motion to

15 Quash made by the Debtor later, the Debtor filed that

16 because it was served with formal Rule 2004 discovery

17 requests and was obligated under Local Rules to file an

18 objection by a date certain.

19          We had thought we had an agreement to enter into

20 a stipulation to try to consensually resolve that Motion,

21 but after the Debtor wouldn't agree to another two-week

22 extension, the Committee decided it wanted to put on for

23 hearing the Motion to Quash rather than try to consensually

24 resolve the matter.  We have reached out and told the

25 Committee we are willing to try to resolve it consensually.

1           Certain of the Committee's accusations and

2    unsubstantiated allegations are set out in the chart that's

3    attached to the reply that was filed in support of the

4    Disclosure Statement.  That's Mr. Fallquist's declaration

5    that was admitted into evidence.

6           The Debtor also included a cash flow budget with

7    the reply so that the Court and parties-in-interest could

8    understand just how limited the Estate resources are and the

9    need to have confirmation on the timeline that's proposed.

10          We believe that the Committee should not be

11   taking a scorched Earth litigation path that's here when

12   there's we believe no claim and there's no money to be had

13   in this case.  The case benefits from doing this on the

14   timeline proposed and to the extent that we don't -- there's

15   not massive litigation against Macquarie in particular, then

16   every dollar that's not spent on litigation will come back

17   to the Estate because they are, we believe, significantly

18   oversecured.

19          You would think that this case is simple.  It's

20   about a storm and the extreme pricing and the resulting

21   havoc that was (indiscernible) on the company and its

22   customers and other stakeholders.  We think the value that

23   exists is getting as much as the Debtor's remaining cash to

24   general unsecured creditors as soon as possible and to

25   pursue causes of action against third parties related to the

1  storm events.

2          With respect to the Disclosure Statement, we

3  filed that on the first day of the case, March 15th.  The

4  proposed Amended Plan is a liquidating plan and reflects the

5  embodiment of numerous proposed settlements and compromises

6  each of which is integral with respect to one another.

7          The overall purpose of the Plan is to provide for

8  recoveries to the Debtor's creditors in a manner designed to

9  maximize value and balance the harm to customers caused not

10  by the Debtor but by the extreme pricing that occurred

11  during the winter storm event.

12          Specifically under the Plan, the Debtor's secured

13  lender would, for the benefit the Debtor's Estate, forego

14  the approximately $550,000 of the principal base amount that

15  is owed to it by the Debtor.  It would agree to receive

16  interest at the non-default contract rate rather than

17  seeking to collect default interest and otherwise would be

18  paid on its allowed claim including reasonable attorney's

19  fees and be entitled to reimbursement of LC if that LC is

20  drawn and if it's not drawn, that money comes back to the

21  Estate assuming that there is a litigation and attorney's

22  fees don't eat into it.

23          The holders of allowed Class 5 customer claims

24  who are the former customers, if they vote in favor of the

25  Plan or abstain from voting, they would be considered

1  participating customers under the Plan.

2          All customers have the opportunity to receive

3  releases from the Debtor and the other release parties for

4  all claims including with respect to their unpaid bills.

5  That would be in exchange for releases by the Debtor -- to

6  the Debtor and the release parties.

7          Although the Debtor doesn't believe that

8  customers are entitled to a refund, right, they're a pass-

9  through and we got the money from the customers and paid it

10 to creditors, we did hear from parties-in-interest that sort

11 of the bookend of people being released from their unpaid

12 bills was that people also paid their bills.

13         And so in order to try to bookend the unpaid

14 versus the paid, we have revised the Plan to provide a

15 carve-out to the customer release, so if a customer opts

16 into a customer release -- or doesn't opt out of the

17 customer release, excuse me, they would be entitled to

18 assert a claim so they have to file a claim for the amount

19 that they paid for their electricity consumption during the

20 storm.  And the period is defined as February 13 through

21 February 19.

22         If they do that and the claim matches the

23 Debtor's books and records, they would have an allowed claim

24 and they would be entitled to share some causes of action

25 related to the winter storm.  So if the Debtor successfully

1  pursues causes of action related to the winter storm, then

2  those parties would be able to share pro rata with other

3  general unsecured creditors with respect to those causes of

4  action.

5         Any former customer that doesn't wish to exchange

6  releases will be considered a non-participating customer and

7  would not be treated as having an allowed Class 5 customer

8  claim.  Rather that customer would have a temporarily

9  allowed claim in Class 4, which is the other general

10 unsecured claims, purely for the purposes of voting on the

11 Plan.

12        For all other purposes, if a non-debtor as a non-

13 participating customer highly properly filed a unsecured

14 claim, then they would be treated as the holder of the Class

15 4 other general unsecured claim in Class 4.  Then other than

16 for purpose of voting on the Plan, any former customer who

17 does not wish to exchange release so the non-participating,

18 but they don't file a proof of claim, then they wouldn't

19 have a claim against the Debtor.

20        With respect to holders of other general

21 unsecured claims, they would receive on a pro rata basis the

22 aggregate amount of available cash that's in the Estate and

23 a net recovery proceeds from any causes of action.  As I

24 mentioned, with respect to causes of action related to the

25 winter storm event, they would share pro rata with those

1    customers who have allowed claims for paid amounts.

2            The Debtor would appoint a plan administrator and

3    that plan administrator would act as a fiduciary and have

4    full authority to administer the liquidation and wind-down

5    of the Debtor under the provisions of the Plan.

6            Your Honor, with respect to approval of the

7    Disclosure Statement and the voting procedures, as set forth

8    in our Motion and the Reply, the Disclosure Statement

9    satisfies the requirements of Section 1125 of the Bankruptcy

10   Code.  As Your Honor knows, the purpose of the Disclosure

11   Statement is to provide adequate information, that is,

12   information of a kind that has sufficient details to enable

13   a hypothetical reasonable investor to make an informed

14   judgment about the Plan.  The Disclosure Statement Hearing

15   is not intended to be a mini confirmation hearing and

16   objections pertaining to the confirmability of the Plan are

17   appropriately left for confirmation.

18           The Motion also seeks to implement standard

19   voting procedures in this district and the Debtor believes

20   will allow voting and both tabulation to proceed in a fair

21   and oddly manner.

22           With respect to former customers, the Debtor

23   ended up scheduling all of the Debtor's former customers as

24   having contingent unliquidated disputed claims in

25   undetermined amounts.  The Motion seeks to temporarily allow

1   for former customer claims assuming no proofs of claim have

2   been filed after the voting record date in amounts of a

3   dollar solely for voting purposes.  So similar to the

4   original proposed, if there's a contingent unliquidated

5   claim and no proof of -- and the proof of claim hadn't be

6   filed, the temporarily allowance would be counted as a Class

7   5 claim for participating customers and as a Class 4 claim

8   for non-participating customers.

9          As I mentioned the only timely filed objections

10  we received were from the Creditors' Committee and their

11  class.  The non-timely filed objection we received the other

12  night was from Ms. Karen Prescott, the alleged tort

13  claimant.  We attempted to add language to the Disclosure

14  Statement to address what we believed were the disclosure

15  statement objections, but otherwise we believe the

16  objections are plan confirmation objections and are not ripe

17  for discussion.  And as we'll get to, we don't believe any

18  additional disclosure is required in the Disclosure

19  Statement related to tort claimants.

20          On the 27th, we filed redlines of the proposed

21  Second Amended Plan, the related Disclosure Statement and

22  the Disclosure Statement Order including exhibits to the

23  Disclosure Statement Order.

24          Before we get to the objections, if Your Honor

25  would like, I can go through the revisions to the Disclosure

1  Statement, the Plan and the Order just depending on how you

2  would like to proceed.

3          THE COURT:  So first of all, I think that the

4  revised Disclosure Statements are a big improvement over

5  what we had and I appreciate the efforts that are being

6  undertaken.  I was not able to discern from them with

7  respect -- and I know that the releases have been revised.

8  I could not find the Disclosure Statement on a release party

9  by release party basis -- and I don't mean you have to

10 identify each one and say, "Here it is," but to be sure that

11 you cover them all, why it was in the best interest of the

12 Estate to release them.

13         I think with respect to the officers and

14 directors, the Debtor said, "With respect to the

15 officers" -- and I'm paraphrasing -- "officer and directors,

16 they may have indemnity claims, therefore we're releasing

17 them, gets rid of the indemnity claims.  We think that's a

18 good deal."  And I don't know that you can name each one by

19 name.

20         But with respect to any other releases, I didn't

21 see any reason given in the Disclosure Statement as to why

22 you were doing those.  And I don't think that's a

23 confirmation objection.  I think that's an informational

24 objection.  Maybe I missed it, but is that fair?

25         MS. SPIGEL:  No.  Your Honor, I think that in

1  Article 2, Section D of the Disclosure Statement, we have

2  included additional disclosure related to the releases.

3  It's on page 17 of the redline at Document 213-2.  With

4  respect to --

5          THE COURT:  Here, let me -- hold on, let me get

6  that open.

7          MS. SPIGEL:  Oh, absolutely.  I'm sorry.

8          THE COURT:  213-2, page 17?

9          MS. SPIGEL:  Uh-huh.  Yeah.

10          THE COURT:  I'm on page 17 of the redline.

11          MS. SPIGEL:  Okay.  Where it says, "Debtor

12  releases."

13          THE COURT:  I'm on page 17 of the ECF.

14          Do you want page 17 of the Disclosure Statement;

15  is that --

16          MS. SPIGEL:  I'm sorry, it's Document No. 213-2.

17          THE COURT:  I'm at 213-2 and at the top, I'm on

18  page -- let me get there.  I think I know where we're

19  supposed to be.

20          MS. SPIGEL:  30 of 80.

21          THE COURT:  Yeah, it's 30 of 80.  Okay.

22          MR. GIBBS:  I think it's 30 of 80.

23          THE COURT:  Right, I'm there.

24          So how do I tell how it benefits the Estate to

25  give these releases?  I'll give you an example.  You say,

1  "On the carry-over, third, the Debtor believes --

2          MS. SPIGEL:  Yeah.

3          THE COURT:  -- that there are no viable claims

4  against its non-debtor affiliates."  Let me assume that's

5  right.

6          MS. SPIGEL:  Okay.

7          THE COURT:  How does it benefit the Debtor to

8  give releases?  I understand it benefits the non-debtor

9  affiliates.  The Debtor isn't forced to sue the non-debtor

10 affiliates under the Plan.  An administrator could choose to

11 sue them.  I'm trying to understand why isn't benefit of the

12 Estate to give the releases up front?  That's the question.

13         MS. SPIGEL:  Your Honor, the entirety of the Plan

14 is based on a compromise and settlement from an

15 unprecedented crisis.  Griddy was specifically targeted by

16 numerous parties (indiscernible) business model on the

17 prices that were charged to pass-throughs to customers.

18 Griddy has no control over that.  But Griddy -- the entirety

19 of the company has become a target for lawsuits.

20         And part of filing this case for chapter 11 is to

21 enable the entirety of Griddy itself and all of its non-

22 debtor affiliates, et cetera, to be essentially done with

23 this unprecedented crisis, to do the best that it can under

24 the circumstances and to move forward.  And we think that

25 that is a benefit to the Estate because the whole Plan is

1   hinged -- and parcel of that is all of these settlements and

2   compromises embodied in the Plan that includes having --

3            THE COURT:  I don't understand how giving -- how

4   the non-debtor affiliates -- there's a -- first of all, I

5   want to back up for a moment to the Motion to Quash.  In the

6   Motion to Quash, I had originally believed that your firm

7   was representing the non-debtor affiliates in that Motion,

8   but then I understand from subsequent filings that your firm

9   is not representing the non-debtor affiliates.

10           Here, I understand why it's in the interest of

11  the non-debtor affiliates, I even understand why you all

12  think this is just a good idea for the country and I don't

13  even want to question that as I've got it.  I mean, I still

14  need to know and voters need to know why it is in the best

15  interest of the Estate to release non-debtor affiliates.

16  The non-debtor affiliates don't have any claim, I don't

17  think, against the Estate.  Why does it benefit the Estate

18  to release them?

19           MS. SPIGEL:  First of all, I just want to clear

20  up the Record.  We do represent certain non-debtor

21  affiliates.  We represent the parents and the indirect

22  parents of Griddy Energy.  We also, for the limited purposes

23  of accepting discovery from the Committee, we represent

24  Griddy Technologies and Griddy Pro.

25           THE COURT:  So let me tell you what I had

1 understood.  And if I understood this wrong, just fix it.

2 In your disclosure, you tell you represent those entities,

3 but I assumed that you did not represent them in any manner

4 that might be adverse to the Estate itself because you also

5 say you were disinterested.

6          MS. SPIGEL:  Right.

7          THE COURT:  So, yeah, representing them didn't

8 bother me.  You'll notice I signed your Employment Order

9 last night and I think I read that right, but to the extent

10 that there would be a lack of disinterest, I don't think you

11 could or are purporting to represent them.

12          MS. SPIGEL:  Right.

13          THE COURT:  So I need to know from the Estate's

14 point of view not from the non-debtor affiliates' point of

15 view, what is the benefit to the Estate?  And I think that

16 is informational.  I don't -- if the answer is there is no

17 benefit to the Estate, we think it's the right thing to do,

18 I'm actually okay with that answer and people can vote on

19 it.  But I think you need to say up front everything you're

20 going to say about why these releases are granted and if

21 that includes a truthful statement that says, "There is no

22 benefit to the Estate of releasing the non-debtor

23 affiliates, the Defendant nevertheless believes it is the

24 ethical, moral and correct thing to do and we ask you to do

25 it," I think that is fair informationally.  That may turn

1  out to not be something I can confirm and maybe it is

2  something I can confirm.

3         And you'll recall at the last hearing -- and I'm

4  looking at Mr. Jordan -- I said, "I don't even understand

5  how you can sue these people."  And now he's filed something

6  that talks about delivery of electricity.  Your client

7  doesn't deliver electricity, prohibited by law from

8  delivering electricity.  I'm not so sure what all these

9  lawsuit are about, but I'm also not this roving master in

10 equity that can kind of reach out into Texas and say, "I'm

11 going to have everybody behave."  And that's why I need this

12 to be really clear.

13         MS. SPIGEL:  Well, Your Honor, look I do think it

14 is the right thing to do under the circumstances of this

15 case.  I think that as part of the proposal for the entirety

16 of the Plan that it benefits the Estate is part and parcel

17 of it.  We filed a (indiscernible) 11 to try to alleviate

18 the issues related to the storm for as many people as we

19 could and that -- and we think that that is beneficial to

20 the Estate.

21         THE COURT:  How is it beneficial -- I understand

22 your argument it's the right thing to do and I really don't

23 want -- you may be wrong that or you might be right about

24 that, but it's certainly a fair argument that it's the right

25 thing to do.  I don't still understand how that benefits the

1   Estate.  And if the answer is "It doesn't," then this needs

2   to say that so that when whatever we do gets appealed, if it

3   turns out I say, "I'm going to authorize this people" -- I

4   don't know the law for sure.  It may be that people can vote

5   for giving these releases and that you make some deal where

6   the Committee gets another X dollars and they say, "That's

7   fine, we're okay giving those releases."  It may be that

8   having said, "There's no benefit to the Estate," makes you

9   lose on appeal even if you can convince me it's the right

10  thing to do, and I'm not discounting that you might convince

11  me of that, but it has to be there, it has to be there

12  informationally.

13          I'm going to actually -- you're hearing my point

14  and you're being very responsive to my point and I

15  appreciate that.  I probably ought to let Mr. Gibbs fight

16  his own battles for a minute before we go much further, but

17  I think I've identified them and I'm sympathetic to what

18  he's saying.  I don't know that I'm sympathetic that these

19  folks should never get releases because, Mr. Gibbs, you

20  might negotiate something where you agree to give them

21  releases.

22          MR. GIBBS:  Your Honor, I think you're exactly

23  right, that very well could be resolution at the conclusion

24  of our investigation.  I think that counsel for the Debtor

25  is struggling to answer your question because the simple

1 answer is: it is not in the Debtor's best interest to give

2 non-debtor affiliates releases for no consideration.  And

3 I'm fine with them saying that, but -- and if they want to

4 say it's the right thing to do and it's part of a grand plan

5 and one part all meshes with -- each part meshes with the

6 other, that's their argument and we'll fit that battle if we

7 choose to at confirmation.

8          But from an informational standpoint, I

9 completely agree with the Judge -- with Your Honor that it

10 isn't adequate to just put in the additional paragraph that

11 they put in in 213-2.  It's part and parcel of kind of a

12 larger issue regarding the proposed releases and it's

13 probably best to wait until counsel for the Debtor finish

14 their remarks in support of their Motion.

15          THE COURT:  But if, in fact, they include -- and

16 they need to think about this.  I don't -- I'm not going to

17 make Ms. Spigel tell me precisely what language she's going

18 to include, but if she were to agree with me and include the

19 language I just said, would that then satisfy your

20 disclosure objection?

21          MR. GIBBS:  It's a hard question to answer

22 because they -- I think it would partially satisfy our

23 disclosure objection in that it would put on the Record what

24 they believe is the support for what they're proposing in

25 the Plan.

1          What we don't think should happen is the

2    Disclosure Statement go out before we have an opportunity to

3    complete our analysis of whether or not valuable causes of

4    action against the non-debtor affiliates exists and what --

5    and that the Disclosure Statement should also include at

6    least our assessment of the potential value of those

7    recoveries so that customers and creditors, especially the

8    customers who are the benefits of the proposed release if

9    they vote in favor of the Plan or don't vote at all so that

10   they know more intelligently what they're giving up in

11   exchange for getting the releases being honored.

12          THE COURT:  And is that really two weeks for you

13   to understand that and have your statement ready?

14          MR. GIBBS:  It's slightly longer than that,

15   Your Honor, and I don't mean to cut the Debtor off in their

16   arguments and support, but they did tell the Court that we

17   asked for 12 weeks.  We did and it's probably not shocking

18   to the Court that the Committee's first proposal is more

19   than they thought they needed.  That's sort of the essence

20   of negotiation.

21          We did come back to them last week with a

22   proposal for a two-week standstill and it wasn't so that we

23   would just need to two weeks, we wanted two weeks to try to

24   see if we could negotiate global resolutions of all

25   objections to the Plan and if we couldn't, then we'd resume.

1  So it wasn't that we asked for 12 and then we asked for two.

2  I can tell Your Honor that the answer was the same "No,"

3  that they insist on going forward on their timeline, which

4  is why we're here today.  We think --

5            THE COURT:  Yeah, I'm not terribly worried about

6  promoting a deal.  You all can have a deal, not have a deal.

7            MR. GIBBS:  Yeah.

8            THE COURT:  I'm worried about getting the

9  information --

10           MR. GIBBS:  Yeah.  And I'll

11           THE COURT:  Look here's what I've told people

12  before and let me just say it here.  I'm going to allow the

13  Committee to communicate with its constituents what it

14  thinks is wrong with the Plan and I've allowed them to do

15  that based on adequate information provided to the

16  Committee.  It is ordinarily much cheaper to include a

17  statement in the Disclosure Statement that says, "Enclosed

18  with this Disclosure Statement packet is an informational

19  statement by the Committee that sets forth its position.

20  The Debtors disagree with it," but it's enclosed and it's in

21  the same mailing packet.  It's a lot cheaper.

22           MR. GIBBS:  Yep.

23           THE COURT:  However if we approve the Disclosure

24  Statement and the Debtor -- and the Committee -- I'll say

25  three weeks from now so that I'm not taking sides in the

1  two-week battle -- three weeks from now has a statement it

2  wants to transmit, it gets to transmit it and the Debtor

3  gets to pay for it.

4          So what I would suggest the parties think about

5  is that we get this Disclosure Statement in a position to

6  approve it in the next few days where it is then held before

7  it is circulated for an agreed period of time so that the

8  Committee can include its statement.  I'm not going to

9  require that.  I think once the Disclosure Statement gets in

10 order, the Debtor has the right to send it out without a

11 statement by the Committee.  I will not require the Debtor

12 to include the Committee's statement, but I will require the

13 Debtor to pay for it when the Debtor -- when the Committee

14 (indiscernible) on its own.  That's an administrative

15 expense of the Estate.

16          And I have expressed before that I have seen

17 activities by this Debtor that show a lot of good faith.

18 Their communications with their customers as we went into

19 the crisis do show good things about -- when I've said that

20 at a prior hearing -- and I will accept at face value that

21 the reason that the Debtor wants to rush is a good one

22 because it's cheaper to rush.  That may though need to give

23 way to slight delays to be sure that the Committee can get

24 don't what it needs to get done.

25          So, Ms. Spigel, we'll go back to you, but I

1    wanted you to know where I am right now on that.

2              MS. SPIGEL:  Your Honor, just related to the

3    Committee's statement, if Your Honor's inclined to allow

4    them to have a solicitation letter that's separate from the

5    Disclosure Statement, we think that that is -- unduly

6    prejudices the Debtor's solicitation.  We think that if they

7    had a statement, we could add it into the Disclosure

8    Statement itself and that we would -- they could have their

9    position, we can have our position.  But having a separate

10   negative solicitation frankly I think that unduly

11   prejudices.  And if you're inclined to just have the

12   separate letter, then I think the Debtor should be able to

13   include its own separate letter as to why the Plan should be

14   confirmed.

15             THE COURT:  So look, the way that I read the case

16   law on this -- and *Century Love* is the leading case on this.

17   I think -- that's old memory, but that's my memory.

18             MR. GIBBS:  Yes.

19             THE COURT:  I not only -- I can't control what

20   the Committee does.  The Committee is free to do what it

21   wants.  If it chooses to send a letter, I have no regulatory

22   authority over what the Committee does.  However, I've got

23   purse string control and if they don't get to include it in

24   your packet, obviously I'm going to make you pay for it as

25   an administrative expense when they include it separately.

1   On the other hand, if you're offering to include it in the

2   packet and they refuse, I may not find it's a reasonable

3   expense.

4          So I can't control their words.  They're free to

5   communicate to their constituency and I have no regulatory

6   authority over their words.  You have a remedy that if they

7   communicate information in bad faith to their constituency

8   of designating all of those votes.  But it isn't -- sort of

9   under First Amendment language, I don't get to pre-censor

10  whatever the Committee gets to do.  I only get to pre-censor

11  what you get to do and that's because of the way 1125 works.

12         But I would give them -- I would give you an

13  opportunity to amend this to give your position as to why

14  these things are necessary and then to reference that there

15  is an attached committee statement.  If you want to add

16  other things from the Debtor in the packet, that is subject

17  to the disclosure statement requirements and we have to

18  approve it.  Doesn't strike me there's anything wrong with

19  that.  If you each want to have whatever this is, an 80-page

20  disclosure statement, and each of you want to have a three-

21  page letter that goes with it, I don't have a problem with

22  doing that.

23         And I'm not going to give them 12 weeks to do it,

24  but I'm going to give him some time to get his letter to you

25  in a form where you can, A, respond to it and, B, include it

1  and we don't have a huge amount of delay.  But I don't think

2  I can tell them they can't do it.

3          MS. SPIGEL:  If I can just ask --

4          THE COURT:  I think I have no authority to tell

5  them they can't do it in advance, right?

6          MS. SPIGEL:  I'm sorry, can you repeat that?

7          THE COURT:  I don't think I have any authority to

8  tell Mr. Gibbs' client, the Committee, that they cannot

9  communicate with their constituents or that I can -- I also

10  don't think I have any authority to regulate the content of

11  their communication in advance.  I have the authority to say

12  that their communication will inappropriate in retrospect

13  and therefore I'll designate votes on account of it, but

14  under the case law, I think that's the limit of my

15  authority.  And I'm happy for people to tell me I'm wrong

16  about that.

17          MS. SPIGEL:  It is my understanding, Your Honor,

18  that in order for a committee -- not only the Debtor, but in

19  order for the Committee to influence solicitation related

20  material as opposed to just communicating with their

21  constituents that that, in fact, was subject to your

22  approval.  It's one thing to --

23          THE COURT:  So I probably need to be educated

24  about that then because that's not what I thought.  First of

25  all, I don't think that I can force you to include their

1  letter in your packet.  You're telling me you want to do

2  that, which is fine with me.  But once you said that --

3  here's what I think -- the way I think the law works and I'm

4  going to give you a chance to prove to me I'm wrong.  Until

5  the Disclosure Statement is sent out, no one can solicit

6  votes.

7          After it's sent out, people can solicit votes and

8  I don't regulate those communications other than through a

9  designation procedure.  And if you believe the law is

10  different than that and that I can regulate the content of

11  committee communications, that is wholly different than my

12  belief and my belief may be wholly wrong and I'm willing to

13  let you convince me of that.

14          MS. SPIGEL:  I was talking about in connection

15  with including information in the Disclosure Statement.  I

16  certainly think that to the extent that we can come to

17  agreement -- I don't agree with their language, but to the

18  extent we can come to agreement on language to be included

19  in the Disclosure Statement that would be subject to your

20  approval, that is what I was talking about.

21          THE COURT:  No, I agree with that.  I completely

22  agree with that.  But I wasn't -- he's not ready with the

23  language yet.  I'm trying to get you an approved disclosure

24  statement in the next few days and that -- the easiest way

25  to do that is to simply have an attachment.  If you want to

1    wait until he gets it and then include it in the body of it,

2    that probably would -- I don't know if that works for

3    Mr. Gibbs or not, but I might.  You're correct, I can't

4    force you to include anything from him in your Disclosure

5    Statement.  That is your statement.

6           Mr. Gibbs, do you agree I can't force them to

7    include your position, that's something you'll have to do?

8           MR. GIBBS:  I agree with that, Your Honor, it is

9    something that would have to negotiated.  I think that --

10   well, if I could?  Let me spend a minute or two and kind of

11   complete the Record at least as the recap of what's

12   transpired in the five weeks since the case was filed and in

13   the three weeks since the Committee was formed and we were

14   retained.

15          Your Honor heard that the Debtor commenced the

16   case I guess three weeks after the conclusion of the storm

17   that devastated the state and shut Griddy Energy down and

18   they filed the Plan on the first day of the case with their

19   Disclosure Statement.

20          And as you heard counsel for the Debtor

21   reference, the Debtor's Plan proposed to release its primary

22   secured creditor in exchange for an agreement by that

23   creditor to walk away from a fairly small amount of cash,

24   about $550,000 that it held a lien on.  This is the same

25   creditor that the Debtor had agreed to give an overreaching

1    adequate protection package on the first day of the case

2    that Your Honor said was wholly unnecessary given the level

3    of security that creditor enjoyed.  And it's also the same

4    lender that was paid over 90 percent of its outstanding debt

5    in the three weeks before the storm and the filing.  It's

6    also the same lender that the Debtor's CEO used to work for

7    and that holds a debt instrument that gives it a right to

8    convert its debt into an ownership interest in the non-

9    debtor parent of the Debtor, which also owns the certain

10   non-debtor entities that own valuable assets.

11        It's the same Plan as Your Honor heard offered

12   all non-debtor affiliates and all D&Os releases of their

13   claims that the Debtor may possess against them for no

14   consideration from any of them.

15        The Plan is structured so if the creditor doesn't

16   vote, the customer doesn't vote of if they vote and don't

17   opt in to the opt-out they get a release and give a release.

18        Your Honor, the Debtor pretty baldly asserts in

19   the omnibus reply to the objection -- it's Docket 215,

20   paragraph 7 -- and I think you've heard almost the same

21   words today from Debtor's counsel.  The Plan is a compromise

22   of all matters leading up to the case.  Each part of the

23   Plan is part and parcel of the other parts of the Plan and

24   all matters must settle in order for the Plan to work.

25        The Debtor is controlled by officers and

1   directors who also directly or indirectly own the non-debtor

2   affiliates and these D&Os and the other entities are all

3   getting releases in exchange for proposing a plan that

4   affords the releases to customers.

5            This may be a great deal for the customers or it

6   may not, it may be a terrible deal.  And the job that I

7   have, as counsel for the Committee, is to find out and

8   that's all we're trying to do.  We are trying to do a rapid

9   but thorough investigation of the Debtor's operations as

10  well as the business of the non-debtor affiliates and the

11  actions of the D&Os to try to assess and evaluate the merits

12  if any of the causes of action that might exist against

13  these release parties in order to try to quantify the amount

14  of potential recovery that the customers would be giving up

15  in exchange for getting a release of debts that they owe to

16  the Debtor.

17           In attempting to do our job, we've been

18  castigated and vilified frankly by the Debtor in every

19  conversation we've had with them, pretty much every email

20  we've received from them and every pleading that they filed

21  now in response to our objection and at least three times I

22  think today been accused to employing a scorched Earth

23  litigation strategy.  We're simply trying to do our job.

24           The Committee was appointed by the Trustee,

25  consists of three former customers and they took seriously

1   their fiduciary duty to represent all creditors including

2   the other 27,000 former customers and they've asked us to

3   take a look at what causes of action may exist and that's

4   what we're trying to do.

5            The Debtor would clearly prefer that there is no

6   inquiry or no examination be done.  They pushed the Plan for

7   vote immediately before we've had a chance to do our job and

8   they'd like the Court to conclude that because they've

9   included a couple of paragraphs in the Amended Disclosure

10  Statement saying in a real conclusory fashion that they

11  don't believe causes of action against these (indiscernible)

12  parties exist that their Disclosure Statement obligations

13  have been satisfied and that the Plan should be sent out.

14  They decided that they know what's best for their former

15  customers and they want to entertain no conversation on any

16  alternatives to the Plan or the proposed timeline.

17           Case in point, Your Honor.  Well, we've indicated

18  to the Debtor that we think a potential claim against the

19  secured lender for marshaling exist and needs to be

20  investigated.  Their response is "No, you don't need to

21  investigate that."  And then they went so far as to point

22  out in their omnibus reply -- I think it's in paragraph

23  32 -- that the guarantees executed by the non-debtor

24  affiliates waive marshaling.

25           Well, they forgot to also include that paragraph

1  that the debt instruments, which the Debtor signed, in favor

2  of Macquarie do not contain a waiver of marshaling.  And

3  it's the Debtor's claim for marshaling that we think needs

4  to be investigated because this lender has its secured

5  claims against non-debtor assets that have value and we

6  believe we need the opportunity to determine whether a

7  meritorious marshaling claim exists and we haven't had a

8  chance to complete that.

9          They also take great pains to belittle our desire

10  to investigate whether sensitive consolidations

11  (indiscernible) before we can support releases of the non-

12  debtor affiliates because we like you can't find any benefit

13  to the Debtor's Estate of releasing the non-debtor

14  affiliates.  And they're activity opposing our efforts to

15  get any discovery from these non-debtor affiliates and we'll

16  take that up on the Motion to Quash later this morning.

17          We already -- the examination we've got and the

18  documents that they've given us already confirms that

19  evidence of at least four or five of the -- I think it's a

20  seven-part nonexclusive list of factors that puts courts and

21  the Fifth Circuit (indiscernible) in considering

22  (indiscernible) exist here and that's why we've been

23  stiff-armed in getting any documents from the non-debtors

24  through -- from the same people that own and run the Debtor

25  that also run those non-debtors.

1          We think it's unwise to conditionally approve the

2   Disclosure Statement today, Your Honor, and instead just ask

3   us to include the letter.  We think it is better to adjourn

4   the hearing for four weeks and let us have a chance to

5   complete and come back to the Court and present to the Court

6   what we think would be appropriate and additional

7   information from the results of our investigation in the

8   Disclosure Statement.  And if the Debtor doesn't agree to it

9   and the Court doesn't think it should be included, we will

10  provide that information to the customers and to the

11  creditors in the case.

12          Your Honor, the Local Rules complex cases in the

13  Southern District in paragraph 29, the one that deals with

14  cash collateral and financing orders, that contain a release

15  of claims against lenders or other third parties by the

16  Debtors, Local Rules give the Committee 60 days at least

17  from the date of the Committee's formation to investigate

18  the claims.  Even those this isn't a cash collateral order

19  or a financing order, it's even larger.

20          It's the Plan (indiscernible) that they're

21  seeking to confirm and they're not giving us at least 60

22  days.  Sixty days from the time this Committee was formed

23  would take you to May 30.  That's roughly four weeks from

24  today.  We think that's the appropriate solution for where

25  we find ourselves today.  They made I think good faith

1   efforts to add in response especially to ERCOT's objection

2   this general language to try to beef up the Disclosure

3   Statement, but it's woefully inadequate with respect to any

4   analysis of the potential value of the claims that may exist

5   against the parties that are being released.  We think by

6   omission they haven't done that investigation and summarily

7   said, "They just don't exist.  This is a unique but simple

8   case and we don't think any causes of action exist."

9            Just let us do our job.  We may agree, but we're

10  not there yet and, in fact, we think there are some

11  potentially meritorious claims.

12           Postponing this to be approved on the 30th and

13  then go out at the end of the May rather than at the

14  beginning of May we don't think is an unrealistic or

15  inappropriate request.  All of the potential confirmation

16  objections that we have that we laid out initially in our

17  disclosure statement objection certainly are more

18  appropriate to be brought before the Court at the

19  Confirmation Hearing, but we don't think it's the right

20  thing to do to approve the Disclosure Statement today as

21  amended and then just give us a short period of time to add

22  several-page letter explaining our concerns.

23           THE COURT:  Thank you, Mr. Gibbs.

24           MR. GIBBS:  So it's a bit of a modification to

25  what you were suggesting, Your Honor.  Thank you.

1            THE COURT:  Thank you.  Ms. Spigel?

2            MS. SPIGEL:  Thank you, Your Honor.  We have --

3    the Debtor has been tried to work with the Committee

4    consensually.  We have a very different view of the

5    situation.  We believe that we have produced all of the

6    responsive documents of their document requests with respect

7    to non-debtor affiliates.  We told them that would work with

8    them, but they wanted to have a (indiscernible).  We have

9    produced documents in the Debtor's possession related to

10   non-debtor affiliates.

11            With respect to Macquarie, the idea of

12   marshaling, first of all, is a very hard claim to make, but

13   let's just say that they could make it.  Then if they were

14   able to do it, the affiliates would have a claim against the

15   Debtor, step into the shoes and be the secured creditor

16   unless they could prove some sort of inequitable conduct and

17   there is no inequitable conduct here.  We ended up in

18   bankruptcy of the unprecedented crisis.  So while we

19   understand that the Committee wants to try to come up with

20   claims to try to get additional value here, if the

21   additional value -- if there's no claims, there's no

22   additional value.  And we have been cooperative.  There's

23   thousands of documents that have been given to the Debtor --

24   I'm sorry, the Committee.

25            When we talk about the cash collateral rule,

1  putting aside that that is not applicable here, there are

2  plenty of cases where plans are filed on the first day and

3  are confirmed within a reasonable time period.  The Local

4  Rules are a guideline and we understand that, but that

5  doesn't mean that Your Honor doesn't have the ability to

6  allow this case or any other case frankly to be on a

7  different timeline.

8          I think the biggest issue here is that we're

9  forgetting that there's very little money in the Estate.  If

10  you look at the budget, there's $900,000 projected on a case

11  basis to be in the Estate at the end of June.  That doesn't

12  account for the $380,000 that the Committee has spent to-

13  date and that doesn't include either the Committee's

14  (indiscernible) for May or June.

15          Allowing 60 days essentially means that the

16  Committee could look into claims, which we believe obviously

17  because it's in the Disclosure Statement that we believe it,

18  have no merit and (indiscernible) end up in a chapter 7 and

19  we are trying to avoid that situation.  And so while we

20  understand that the Committee has -- would like to

21  investigate claims and that's fine, we don't object to that

22  investigation, and certainly they continue -- they can

23  continue that investigation for the next four or five weeks

24  before confirmation, we don't believe that the Disclosure

25  Statement certainly should be delayed as a result of that.

1          The idea that there are claims here we have

2    looked into and, as you noted, we don't think that

3    (indiscernible) certainly could represent different non-

4    debtor affiliates because we would be disinterested.  We

5    looked into those claims and we don't believe that they have

6    any merit.  Again that's fine for the Committee to do their

7    investigation.  We're not saying don't do it.  And we do

8    believe that we gave them documents, but we don't believe

9    that there should be -- and we do think it's

10   (indiscernible).  We have totally different views of what is

11   going on in this case.  We are willing to provide them an

12   opportunity to put information in the Disclosure Statement

13   and we have asked them many times if they wanted to include

14   information and they haven't.

15         And so the idea to kick these cases, then we're

16   going to end up administratively insolvent and I don't think

17   that is in the best interest of any of the stakeholders and

18   I don't think that that is the Committee fulfilling its

19   fiduciary duties to its constituents.

20         THE COURT:  Thank you.  Let's move to the Motion

21   to Quash.

22         Who's going to represent the non-debtor -- as I

23   understand it, you're telling me you don't need motion to

24   quash against the Debtors because you've produced, whatever

25   documents you have already been produced.  The Motion to

1   Quash under that statement would be moot as to the Debtors.

2   So all I'm worried about, I think, are the non-debtor

3   affiliates.

4           Why shouldn't the non-debtor affiliates --

5           MS. SPIGEL:  Your Honor --

6           THE COURT:  -- respond to the requests?

7           MS. SPIGEL:  Your Honor, my partner,

8   John Lawrence, is going to be responding to you with respect

9   to the Motion to Quash.

10          THE COURT:  Thank you.  Let me get that line

11  added in.  I see we have a 214.

12          MR. LAWRENCE:  Yes.  Thank you, Your Honor.

13  John Lawrence, on behalf of Debtor.  And, I'm sorry, you

14  were unmuted.  I missed your question you asked.

15          THE COURT:  Oh, I apologize.  Ms. Spigel says

16  everything that the Debtors have that's been requested has

17  been produced, which then makes the Motion to Quash moot as

18  to the Debtors.  I don't understand why the non-debtor

19  affiliates shouldn't similarly produce what they have.  I

20  don't know why we're quashing this as to the non-debtor

21  affiliates and I don't know why the quash as to the Debtors

22  isn't not moot.

23          MR. LAWRENCE:  Well, let me make one

24  clarification.  Just what the non-debtor -- sorry.  What the

25  Debtor has produced or the Debtor agreed to produce on Day

1  One and has told the Committee consistently they would

2  produce is all documents in the Debtor's possession that

3  relate to the non-debtor affiliates so long as those

4  documents also relate to the Debtor in some way.  So what

5  has been produced by the Debtor would not include every

6  document related to non-debtors.  It does absolutely include

7  every document that they have requested of the Debtor that

8  relates to non-debtors that has any sort of connection or

9  relationship between the Debtor and the non-debtor.  And so

10 that is still (indiscernible), Your Honor.

11         And maybe let me explain to you our theory of why

12 that makes sense.  Before I do that, (indiscernible) step

13 back so I can say I think all (indiscernible) cases like

14 this are import for making arguments about things about

15 things like fairness and justice and that is (indiscernible)

16 what is at issue in every case, right?  But here I think the

17 reason for the Motion to Quash -- and this relates to Ms.

18 Spigel' arguments on the Disclosure Statement as well -- is

19 something different.  It's really -- it sort of turn on

20 investments, right.  It's diminishing returns.  And we have

21 nothing to hide.  What we can't do -- we can't afford to do

22 is to waste all the Estate's assets on chasing rabbits that

23 don't exist and so let me --

24         THE COURT:  Yeah, but as to the non-debtor

25 affiliates, the Estate shouldn't spend 10 cents producing

1  for the non-debtor affiliates.  That's a non-debtor

2  affiliate expense.

3          What do I care about them spending money?

4          MR. LAWRENCE:  Because the Committee will then

5  spend money on that work.  That is the issue.

6          THE COURT:  I understand the Committee's going to

7  spend money on it.  But your firm will spend zero on

8  producing from non-debtor affiliates.  And the Committee

9  only gets paid if their work was reviewed in retrospect

10  likely -- I forget the exact wording out of the current

11  Fifth Circuit standard, but likely to produce beneficial

12  results.

13          MR. LAWRENCE:  Well, I -- without prejudging

14  future requests for fees, I would say it would be difficult

15  for me to imagine a viable objection to having -- their

16  having reviewed documents after Your Honor as ordered us to

17  produce them.  So I hear you, I think --

18          THE COURT:  Oh, I'll make that real easy.

19          Mr. Gibbs, if I allow you to do this, I am not

20  saying that what you want to do was a reasonable expenditure

21  of your time or money.  It's your choice and your risk.

22  We're not changing that because of the Motion to Quash and I

23  don't think you expect me to; is that correct?

24          MR. GIBBS:  I absolutely don't expect you to.  I

25  know what *Pro-Snax* says and I am --

1          THE COURT:  I guess it's -- yeah, the aftermath

2   of *Pro-Snax*.  I forget what that case is, right.

3          MR. GIBBS:  Yeah, me too.  I just always remember

4   *Pro-Snax*, but we are --

5          THE COURT:  Bad memories last longer than good

6   ones, Mr. Gibbs.

7      (Laughter.)

8          MR. GIBBS:  I think that's right.  We will

9   undertake that risk.  We believe that what we're doing is

10  not only warranted, but it's necessary and it's appropriate

11  and we'll defend our pre-application at the appropriate

12  time.

13         But I think Your Honor's question of Mr. Lawrence

14  is absolutely accurate.  Why should it matter to the Debtor

15  if the Committee wants to get information from the non-

16  debtors?  It's not a burden on the Debtor's Estate to have

17  Debtor's counsel defend that effort.

18         THE COURT:  Go ahead, Mr. Lawrence.  I'm sorry to

19  interrupt.  I don't think that that -- I didn't want anybody

20  to misunderstand that me authorizing them to do something

21  means what they've asked to be authorized to is reasonable

22  because I don't know what information they have.  I no way

23  of judging the reasonableness today and wouldn't preclude a

24  determination that this was an unreasonable effort of their

25  part in retrospect.

1         MR. LAWRENCE:  Understood, Your Honor, and thank

2  you.  It's really the same basic point, Your Honor, which is

3  that based on the Rule 2004 requests that currently exist,

4  we're talking about the Committee taking discovery from 14

5  more entities, 14 separate entities.  They have also said

6  they want to take discovery from the six directors and

7  officers.  We're talking about more than 20 targets of

8  investigation.  It is an expense issue.  At bottom it's an

9  expense issue.  And it's a what is needed for the

10  investigation, right?  Rule 2004 is broad but not limitless.

11  It's their burden -- it is their burden to show there's good

12  cause for the request.

13         And if I can, Your Honor, explain why we don't

14  believe there is good cause to broaden the discovery beyond

15  what's already been produced?  The Committee has said -- and

16  it makes sense -- they are doing an investigation, right?

17  They are doing an investigation and they want to know

18  whether the releases are appropriate and that they want to

19  know does the Debtor have claims against other parties?  And

20  Macquarie -- and those documents and others.

21         Does the Debtor have claims against its non-

22  debtor affiliates?  That's their question.  If I'm asked, as

23  a lawyer, my client to determine whether or not they have

24  claims against somebody else, where do I look?  I look at my

25  client's files -- and in particular I look at my client's

1   files that relate to my client's relationship with those

2   entities that they might want to sue.  We have given them

3   that information.  We have given them the information they

4   would need to determine whether or not there are claims or

5   are viable claims against the other entities.

6          If they determine ultimately there are viable

7   claims, could they then seek additional information from

8   those targets?  Potentially.  That's not where we are today.

9   Where we are today is the question of whether or not they

10  need discovery from like 20 more people including entities

11  to determine whether or not the Debtor has claims against

12  those people.

13         And while Your Honor obviously has to right to

14  deny the requests in the future, the cash burn in this

15  case -- we're going to run out of cash before we get to the

16  request.  It makes sense to limit the discovery to what is

17  needed to do our jobs.  We understand their jobs and respect

18  their jobs, we understand their duties and their duty is to

19  investigate whether they have claims right now.  And what we

20  have given them is what is reasonable, whether or not they

21  have those claims.  That is (indiscernible) argument, Your

22  Honor, is that anything beyond that is something that is not

23  necessary to determine whether or not they have these

24  claims.

25         We have (indiscernible) we've offered

1  consistently to work with them.  When we conferred with them

2  on these issues on the 16th of April, we said, "Let's start

3  with this.  Do you want to start with this idea I told Your

4  Honor today?  If you have more questions about individual

5  entities, let us know."  We've been doing that.  We've given

6  them more information about certain specific entities.

7  We've done that formally and informally through discussions

8  with the financial advisor and otherwise and that's what we

9  want to continue doing.

10       We think it makes the most sense for the parties

11  to continue working cooperatively through this.  We don't

12  think there's more they need, but if they can give us more

13  specific requests of why they need we'll give it to them, if

14  we think it's appropriate.  In their objection itself, they

15  listed two things that they said they needed related to the

16  non-debtor affiliates.  I reached immediately and I said,

17  "You want these?  We'll give them to you."  We gave it to

18  them.

19       It is (indiscernible) so not appropriate for them

20  to just start off searching for documents related to 20

21  different entities without being able to connect any of

22  those entities to a claim from the Debtor at this point.

23       THE COURT:  Thank you.  Mr. Gibbs, I want you to

24  respond to one issue, which is whether with respect to your

25  requests to the Debtors, he is saying that they shouldn't

1   have to turn over to you material about a non-debtor entity

2   that is unrelated to the Debtors.  That seems like a pretty

3   rational line to draw.

4           Do you have any problem with that line?

5           MR. GIBBS:  No, I don't, Your Honor, and I think

6   it's kind of a much ado about nothing.  We asked for the

7   Motion to Quash to be heard today because of the fact that

8   the Debtor was pursuing approval of the Disclosure Statement

9   today and asking to have a plan go out for vote today before

10  we've had a chance to complete our investigation, and where

11  we acknowledge that the Debtor has been forthcoming and

12  responding to our document requests, they've gone us a lot

13  of pages and a number of documents and we're dutifully

14  reviewing them and they have given us information in the

15  possession of the Debtor related to non-debtors, but there

16  are a number of non-debtors that are also guarantors or co-

17  makers of the debt to Macquarie and some of them have

18  pledged assets.  And there are -- there's an overlap of the

19  ownership and overlap of the officer and directors.

20          And the targeted information that we will be

21  wanting from non-debtors we think is related to -- they're

22  related to the Debtor because they're either co-obligors or

23  guarantors of Debtor's obligations and their assets are

24  being used by the Debtor and we think it's -- the nexus is

25  clear and the appropriateness of doing that discovery is

1  also entirely clear.

2          So saying 20 entities and 14 entities and six

3  people, while as I understand it they've removed the release

4  from three of the six officers and directors in their

5  Amended Plan so that sort of cut that number in half.  And

6  there's a number of shell corporations that have -- we

7  understand have no assets and are related to non-debtor

8  affiliates but not related in particular to the Debtor's

9  operations.  It's really a couple of debtors and its direct

10 and indirect parent -- excuse me -- a couple of non-debtors

11 and their common direct and indirect parents.  So it's three

12 or four non-debtor entities all of whom are obligated to

13 Macquarie some of whom have pledged assets to secure their

14 obligations to Macquarie that we're -- we need to focus on.

15          THE COURT:  All right.  Here's what we're going

16 to do today: with respect to the request to conditionally

17 approve the Disclosure Statement, for the reasons I've gone

18 through, I don't think that the Disclosure Statement is

19 fully ready for any conditional approval because it fails to

20 set forth the benefit to the Estate questions and I want to

21 give the Debtor an opportunity to get that done.  I'm not

22 denying conditional approval at this point.  I'm allowing

23 the Debtor to amend to obtain conditional approval of the

24 Disclosure Statement.

25          We're going to return for that for hearing on

1    May 20th, at 10:00 o'clock in the morning.  I think it is

2    unlikely, not impossible, that the Committee will be able to

3    have further delay beyond May 20th if it doesn't then know

4    what's wrong.  I know they've asked for more them than that,

5    sorry.  So we'll see you all on that May 20th, at 10:00

6    o'clock.

7                With respect to the Motion to Quash, I'm going to

8    ask that an amended order be uploaded by the Committee with

9    Mr. Lawrence having signed off on it that honors his request

10   as to the Debtor not having to produce information they have

11   about non-debtor affiliates that is unrelated to the Debtor.

12   That is a reasonable line to draw.  And similar lines can be

13   drawn with respect to the non-debtor affiliates if there's

14   some over-expansive requests.  But in general, I'm going to

15   require that the non-debtor affiliates and the directors

16   participate and respond to the discovery.  I'll get you all

17   to upload an order that does that.

18                That discovery needs to commence now.  If there

19   is recalcitrance in that discovery, then maybe Mr. Gibbs

20   will have some argument on the 20th that you all didn't

21   respond quickly, but I'm pleased to hear really from both

22   sides that that's not been a problem in the case.  People

23   have been promptly responding to stuff so I don't expect

24   there to be a difficulty about that.

25                With respect to the ordinary course

1  professionals, which you all haven't talk about, there was

2  already a certification filed on that.  I'm going to orally

3  authorize the two that aren't the -- I don't remember the

4  name of the company, the corporate communications company.

5  I'm not going to authorize that part of it today and the

6  reason I'm not is: there were pretty good objections filed

7  to that.  I got it, this may be a compromise, but the

8  evidentiary Record is now totally lacking as to why I should

9  authorize the payment of the $27,000 to them and I want to

10 give the Debtors an opportunity to make that case.

11         So go ahead and pay the other two ordinary course

12 professionals in accordance with the Order on our oral order

13 on the 20th.  We'll take back up whether we ought to

14 authorize the 27 -- excuse me -- I think it was 27,000 or

15 27,500 -- once there is evidentiary support that hiring a

16 corporate communications firm to do work in a liquidating

17 company post-filing makes sense.  I can imagine there are

18 ways when it does and I don't mean to put this -- I don't

19 mean that to be pejorative in that wording, but I don't have

20 any of that in an evidentiary Record right now to allow me

21 to sign it.  And the reason I don't is that wasn't the focus

22 of the Motion.  It's the focus of what looks like a

23 compromise on the Motion and I don't want to be ruling on

24 that without a good evidentiary record.

25         That's what I intend to do today.  I'm looking at

1   all the faces on Zoom and I'm by far the oldest person here,

2   so I'm going to give a little bit of advice.  I think

3   simultaneously saying someone is acting in bad faith but

4   you're being cooperative and you expect them to be I think

5   is a different world to act in.  Let's let people do their

6   jobs.  I've got really good professionals.  I think everyone

7   here is trying to do their job.

8              And I would ask that the parties try and tone

9   down the conversation a little bit.  The more you tell me

10  somebody is acting inappropriately when they're doing their

11  job the less ground you're gaining with me and I would just

12  suggest from age that you listen to that one comment.  If

13  you don't want to, that's okay, it's not an order, but that

14  would be my request.

15             Is there anything we need to do on the Khoury

16  adversary proceeding today?

17             MS. SPIGEL:  Your Honor, it's Robin Spigel.

18             May I speak before you turn to the adversary

19  proceeding?

20             THE COURT:  Of course, Ms. Spigel.

21             MS. SPIGEL:  Thank you.  Just a couple of things.

22  On the ordinary course professionals Motion, there was --

23  part of the revised Order is -- another ordinary course

24  professional was hired by the company, Amy Stewart Law

25  Group, which a boutique insurance firm.  We've --

1              THE COURT:  You're right.

2              MS. SPIGEL:  I think it's one of the --

3              THE COURT:  You can do all of that.  The only

4    part that I don't want to do is to authorize the 27 or 27-5

5    until I have an evidentiary record to support that.  That's

6    the only thing I'm cutting out.  You can act on the rest of

7    it.

8              MS. SPIGEL:  In Mr. Fallquist --

9              THE COURT:  And I am not denying that.  I want

10   that to be clear.  I just don't have a record to do it on.

11             MS. SPIGEL:  Okay.  In Mr. Fallquist's

12   declaration in response to the Committee raising the

13   (indiscernible) we did include an evidentiary basis for

14   (indiscernible) in this case.  We did -- we actually --

15             THE COURT:  I may have -- can you take me there?

16   Because I may have missed it.

17             MS. SPIGEL:  Yeah.  Give me one second if you

18   don't mind.

19             MR. SPEAKER:  I think by agreement with ERCOT,

20   that declaration was not included in the evidence today but

21   I may be wrong.

22             MS. SPIGEL:  It's not the First Day declaration.

23   It's the declaration of Mr. Fallquist in support of the

24   reply.

25             MR. SPEAKER:  Oh, okay.  My apologies.

1          THE COURT:  Yeah, let me just find that.  That
2   was 218.
3          MS. SPIGEL:  It's (indiscernible).
4          THE COURT:  It was part of 218-2, I think, right?
5          MS. SPIGEL:  I only have (indiscernible) copy.
6          Is (indiscernible) on?
7          MR. SPEAKER:  Yeah, that is -- I think Your Honor
8   is correct that is 218-2.
9          MS. SPIGEL:  Okay.
10          THE COURT:  So tell me where I would find the
11   evidentiary support on the 27,000.
12          MR. SPEAKER:  It's on page 6 of the chart that's
13   behind Mr. Fallquist's declaration I believe.
14          THE COURT:  Okay.
15          MR. SPEAKER:  Actually 697.
16          THE COURT:  So this talks about 11,000.
17          Am I remembering the Order wrong with 27,000 in
18   it?
19          MR. SPEAKER:  That's actually --
20          MS. SPIGEL:  Go ahead, Trey.
21          MR. SPEAKER:  Yeah.  The 11,000 reflects net of a
22   retainer.  They have about a $60,000 retainer remaining from
23   prior to the case.
24          THE COURT:  Got it.  I'm going to withdraw my
25   comments and I'm going to go ahead and approve the Order.

1  It's agreed to and I will sign that Order.  I had missed
2  that part of it and I think that is a valid basis.  In
3  essence, I'm going to interpret that to say that there's a
4  lot of litigation coming and you want people to have
5  adequate information before they decide to litigate.  Seems
6  fair, the parties agreed to it.  I'm not going to intervene
7  in that and I will sign the Order.

8          Thank you for clarifying that for me, Ms. Spigel.
9  I just -- I had missed that trying to read a lot of stuff
10 getting ready for the hearing.  That was filed as --

11         MR. SPEAKER:  Judge, I believe it's 219-1 is the
12 proposed Order.

13         THE COURT:  Is it 219-1 or 219 -- yeah, 219-1.
14 Let me get that done right now.

15         MS. SPIGEL:  Your Honor, may I say one more
16 thing?

17         THE COURT:  Of course.

18         MS. SPIGEL:  Thank you.  It's around
19 (indiscernible).  We obviously think that (indiscernible)
20 concern then is to -- for the (indiscernible) approval of
21 the Disclosure Statement.  We would I guess respectfully
22 request that either it be shortened or that we have the
23 ability to come back to Your Honor on an emergency basis.
24 I'm very worried about this case being administratively
25 insolvent and I just -- I'm just worried about it being

1  administratively insolvent and I do think that three weeks'

2  worth of discovery on various parties, even if the non-

3  debtor parties are not paying -- they're paying for the

4  Committee and other -- there's other constituents that are

5  now coming out like (indiscernible) for example and I'm just

6  worried about the case becoming administratively insolvent.

7  So I just want to reserve the right to come back on a

8  shortened notice period to try to figure out if we can do

9  this quicker.

10       THE COURT:  Yeah.  Look I'm not going to take

11  away from the right to come back on an expedited basis or on

12  an emergency basis.  I think whenever you think that's

13  appropriate, I need to trust your judgment and then read

14  what you have to say.  I may not agree with it, but I should

15  trust that it's filed in good faith.

16       I very much believe in the committee process and

17  that becomes heightened in a case where your concerns are

18  that their constituency is going to less if they get to do

19  what they want to do and it doesn't hurt anybody else.  You

20  will have an uphill battle telling me that they're not going

21  to cause the Estate to run out of money, which is going to

22  mean their constituents aren't going to get paid anything,

23  and there's no other adverse effect to the delay and that's

24  marginally what I'm hearing is: we might have to convert to

25  a 7, which hurts the unsecureds.  It doesn't hurt anybody

1  else.  They're going to get paid less because the money's

2  going to get devoted to professional fees.  Hurts their

3  county, no one else.  And the committee system is designed

4  by Congress to serve the interest of that constituency.

5           Now I think if you look at Marvin Isgur's record,

6  I am pretty far from a committee rubber stamp.  I think I

7  turn down lots of things that committees asked me to do, but

8  I think that the process is terribly important and it's rare

9  that I don't give them an opportunity to go through the

10 process.  That's why I'm doing what I'm doing.

11          I'm telling you that so that when you consider

12 whether it's worth your time to file that, you understand

13 the perspective that I am coming from.  I said I think

14 almost on day one of the case but if no, like on day three

15 or four of the case -- Mr. Gibbs wasn't here yet -- that I

16 think customers who probably have no claim against Griddy

17 and who getting released should probably be pretty happy

18 with that.

19          And so I don't know that I'm even agreeing to

20 where he's going in the case.  That's now what you ought to

21 be hearing on this.  What you ought to be hearing is I think

22 he gets -- and don't I don't mean to steal is words -- he

23 gets to do his job and it's very important to me that he

24 gets to do his job.  I'm making him move faster than he

25 wants.

1          But you are certainly free and I respect what

2     you're doing.  If you need me to reconsider what I've done,

3     I'll let you deal with it.  And no question that you ought

4     to do that if you think you have to.

5          MS. SPIGEL:  Thank you, Your Honor.  And one

6     final comment then I'll let to the adversary proceeding so

7     thank you.  This is in response to the Disclosure Statement

8     and then putting aside with the Committee comes out and if

9     we put something in the Disclosure Statement not related to

10    that.  Is the only other issue that Your Honor is raising is

11    related to the debtor release and putting in the information

12    related to the benefit to the Estate or were there other

13    issues?  I just want to make sure that when we come back

14    that we have it properly addressed if there are other things

15    that --

16         THE COURT:  That was the 600-pound gorilla for me

17    and I don't know if there was some of the more "picky"

18    comments and I hope nobody takes offense to that word but,

19    yeah, it should be fixed.  I did not have a chance with the

20    latest version that you filed, which I think was filed late

21    yesterday, to compare word for word to see, but I looked at

22    that big issue and thought that we -- the big complaint that

23    you're getting in the case is: you're doing a lot of stuff

24    for a lot of people and we can't really tell that that's the

25    best thing to do.  There may be other minor issues, but

1  there will be nothing else that we wouldn't be able to

2  resolve on that day.  I'll sit here and type words in if I

3  have to.

4          MS. SPIGEL:  Okay.

5          THE COURT:  If anybody thinks I'm missing some

6  big issue, please speak up.  The big issue to me was the one

7  that I've identified.

8      (No audible response.)

9          THE COURT:  Okay.  Thank you.

10          MS. SPIGEL:  Thank you, Your Honor.

11          THE COURT:  Thank you.  I do have somebody that

12  does want to speak up and let me let them do that.

13          Mr. Jordan, good morning.

14          MR. JORDAN:  Your Honor, this is Shelby Jordan.

15  I think you just unmuted my line.  Is that -- can you hear

16  me?

17          THE COURT:  I did and I said, "Good morning," to

18  you.

19          MR. JORDAN:  Okay.  I didn't hear that.  Thank

20  you very much, Judge.  Very quick comments.  We had filed at

21  Docket No. 5 -- I'm sorry -- Docket No. 227 our Motion to

22  lift the abatement order.  This has been a scramble in my

23  world, not yours, to deal with what the accommodation you

24  made to us with respect to the tort claimant's claims and

25  the nature (indiscernible) of the extent.  We've addressed

1  that in Docket No. 227, but it was on file yesterday because

2  we had to file -- because I wanted to be certain my

3  objections to the Disclosure Statement didn't violate that

4  Order.  And so I wanted it on file so the Court knew that we

5  were scrambling as best we could to get not only the Court's

6  questions answered, but to then assert our objections.

7           And I would simply ask this that the real

8  direction of our objections -- I hope to be heard on May 20

9  after the Court has had a fair opportunity to digest the

10  tort claimants' position as to why their claims are good.

11  What I have been so concerned about over the last 10 days is

12  that the Court's posture and position on the Griddy claims

13  though fairly understood -- I mean, I understand exactly

14  what the Court asked for.  I understand that we did not

15  furnish that to the Court and were not ready to do that when

16  you asked it so it's our problem.  We tried to put that

17  problem back in your court so you can either get comfort

18  with it or --

19           THE COURT:  I'll set that for hearing on the 20th

20  at 10:00 o'clock with the other things, sure.  I do want

21  you --

22           MR. JORDAN:  All right.  In the --

23           THE COURT:  You need to be prepared to address

24  another issue though, which is --

25           MR. JORDAN:  All right.

1          THE COURT:  -- I read it pretty quickly last

2   night.  I have focused on what you wrote.  I don't know how

3   you have standing to worry about people who owed your

4   clients.  Your clients --

5          MR. JORDAN:  Well, I will address these, sir.

6          THE COURT:  Yeah.  You clients had notice, your

7   clients have filed proofs of claim, your clients can do what

8   they want and I don't know why you have standing to worry

9   about other potential tort claimants out there that you

10  don't represent.  And so on the 20th, you'll need to deal

11  with that.  You don't need to deal with it right now.

12         MR. JORDAN:  All right.  We'll address that in

13  connection with also the request for the tort committee that

14  we had initially pursed with, but we'll address that, Judge,

15  and address the issue -- the other issue that is

16  (indiscernible) biggest cocaine is there's a massive hole in

17  the assets of this Debtor that's nobody discussing because

18  of the nature of this claim.  There is insurance.  There's

19  TGL insurance that pays the proceeds typically paid.  The

20  Fifth Circuit's made clear that the Debtor now has interest

21  in those proceeds and has an obligation to deal with those

22  proceeds where before the insurance carriers would ignore

23  the Debtor and those proceeds.  That's the not the law

24  anymore.

25         And our problem is that when we discuss what our

1  tort claims are, I know that the Court's observations

2  weren't -- you're not denied our claim.  I mean, we're

3  not -- we realize we're not in the claims allowance process,

4  but it's being treated that way and that's the thing that I

5  want to express to the Court that there's -- if you just

6  word search the Second Amended Plan and Disclosure Statement

7  the word "tort" comes up three times.  And it's two times in

8  releases that they propose.  They want releases from torts.

9  But it also comes up in one section where it says "and other

10  torts."  That's it.

11          There's no -- they reference that all insurance

12  is going to be preserved.  (Indiscernible) about the nature

13  of the insurance, the type of insurance, what it would

14  cover, does it cover tort claims?  And so that has been our

15  dilemma of getting our word to the Court under the terms of

16  the type of objection we have, which we will argue and deal

17  with on the 20th and so I'm not trying to do it here.

18          But I just want to point out to the Court that

19  there is a complete set of assets that are -- that whose

20  policy belongs to the Debtor and who the Debtor now has

21  under the *OGA* (phonetic) Fifth Circuit case a cognizable

22  interest that it should be exercising its fiduciary

23  obligations to, for instance, tell the insurance companies

24  that there are tort claims.  Now we can't do that now

25  because those policies belong to the Debtor.  The automatic

1   stay probably prevents us from notifying the insurance

2   companies that we have claims.

3            And so my concern is that those queues have

4   been -- there's not addressed anywhere in any disclosure,

5   there's no discussion of even tort claims in any disclosure

6   and those are the times -- those are the concerns of time

7   limits that are running with respect to the tort claims.

8   We'll address all that then on the 20th.

9            THE COURT:  Thank you, Mr. Jordan.  I will say

10  you certainly asserted tort claims whether they are valid or

11  not valid and I would be really surprised if insurance

12  companies hadn't been notified about that, but I'll let you

13  talk to the Debtors to see.  You've asserted claims.  They

14  may be ridiculous and they may be fantastic, but you've

15  asserted them and I would be pretty surprised if people

16  didn't notify their insurance.  We'll do with that on the

17  20th.

18            Let's me on now to the adversary --

19            MS. SPIGEL:  Your Honor?

20            THE COURT:  I'm sorry, go ahead.

21            MS. SPIGEL:  I'm sorry, Your Honor.  I just heard

22  Mr. Jordan say a couple of things and I just need clarity.

23  So on the 20th, he mentioned a motion for a tort committee.

24            Did I misunderstand that?

25            THE COURT:  He had originally asked --

1           MR. JORDAN:  May I speak --

2           THE COURT:  -- for a separate committee --

3           MS. SPIGEL:  Okay.

4           THE COURT:  -- and at the hearing that we had

5    probably three weeks ago, I said I didn't even understand

6    how they had tort claims because you all didn't do --

7           MS. SPIGEL:  Understood.

8           THE COURT:  -- you had no authority to do it.  I

9    didn't deny it and he had the right to bring it back up

10   again.  He's bringing it back up.

11          MR. JORDAN:  Actually, Your Honor, I didn't bring

12   it back up.  I'm sorry to interrupt.  I did bring it back up

13   with the idea that it will be heard on the 20th.  We

14   probably are not going to ask it be heard on the 20th.  In

15   fact let me just say unless that change -- unless something

16   changes drastically based on what the Committee and the

17   Debtors do, we're not going to ask for it be heard on the

18   20th.

19          THE COURT:  Okay.  Thank you.

20          MS. SPIGEL:  Thank you for clarification.

21          THE COURT:  Mr. Potts?  Let me go ahead and

22   activate Mr. Potts' line.

23          What are we doing in the adversary proceeding,

24   Mr. Potts?

25          MR. POTTS:  Hi, Judge.  Can you hear me?

1          THE COURT:  I can you find.  Good afternoon -- or

2     good morning.

3          MR. POTTS:  Good morning.  We're working really

4     closely with the Committee and we filed a stipulation with

5     the Debtor on March 31st and I think we're asking the Court

6     today to just extend that, reserving all rights, reserving

7     our ability to reopen that litigation at a time we deem

8     beneficial, but at this time, I think we're in agreement

9     with the Debtor that things should stay as they are.

10          THE COURT:  Let me ask you and the Debtor this:

11     if we make a docket entry that says, "This adversary

12     proceeding is abated.  Any party-in-interest may move to

13     terminate the abatement at any time," is that what you're

14     asking me to do?

15          MR. JORDAN:  Yes, Your Honor.

16          THE COURT:  Any complaint about that, Ms. Spigel,

17     or whoever's going to take the lead on that for you?

18          MR. LAWRENCE:  Your Honor, John Lawrence.  I'll

19     take that on behalf of the Debtor.  We agree with that, with

20     Mr. Potts said and what Your Honor suggested as the

21     solution.

22          THE COURT:  We'll do that.  We'll make that

23     docket entry and we'll no other action in the adversary

24     proceeding.

25          MR. POTTS:  Thank you, Your Honor.

1          THE COURT:  We'll see you all on the 20th maybe

2   earlier if a motion gets filed.  I'm not going to set

3   another hearing right now.  I will tell you all that I'm

4   here all month so between now and the 20th, you can get my

5   attention pretty easily and I'll be in Chambers every day,

6   but expect to see you on the 20th.

7          And, Mr. Gibbs, you should get in gear.

8          MR. GIBBS:  Thank you, Judge.

9          THE COURT:  Thank you.  We are in adjournment.

10      (The parties thank the Court.)

11      (Hearing adjourned at 10:38 a.m.)

12                          * * * * *

13          *I certify that the foregoing is a correct*

14   *transcript to the best of my ability due to the condition of*

15   *the electronic sound recording of the ZOOM/telephonic*

16   *proceedings in the above-entitled matter.*

17   */S/ MARY D. HENRY*

18   *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

19   *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

20   *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

21   *JTT TRANSCRIPT #63882*

22   *DATE FILED:  APRIL 30, 2021*

23

24

25